1
2
3
4
5
6
7     UNITED STATES DISTRICT COURT

8     NORTHERN DISTRICT OF CALIFORNIA

9

10    ELLA W. HORN,                          Case No.17-cv-02192-NC

11              Plaintiff,
                                             **ORDER GRANTING**
12         v.                                **DEFENDANT'S MOTION FOR**
                                             **SUMMARY JUDGMENT**
13    CRC HEALTH GROUP, INC.,
                                             Re: Dkt. No. 112
14              Defendant.

15

16         In this employment discrimination case, pro se plaintiff Ella Horn asserts she was

17    subjected to sexual harassment and terminated from her job because of her race.  Horn's

18    sexual harassment claim rests entirely on a single uncomfortable car ride with a coworker.

19    Horn's race discrimination claim is based on allegations that her supervisor ignored her

20    after discovering her race, that a fellow project manager told a racist story and refused to

21    train her, and that a Caucasian employee was provided his own rental car while Horn was

22    forced to share.  Defendant CRC Health Group, Inc. ("CRC") moves for summary

23    judgment, claiming it fired Horn for poor job performance and arguing the evidence does

24    not support Horn's claims such that a reasonable jury could find in her favor.

25         The Court finds that Horn fails to allege actionable sexual harassment, and finds

26    that the evidence, construed in Horn's favor, does not permit a reasonable inference of

27    racial discrimination by CRC.  Thus, the Court GRANTS CRC's motion for summary

28    judgment.

## I.    BACKGROUND

Ella Horn is an African American woman who worked for CRC from June 9, 2015 to July 2, 2015. Dkt. No. 10 (Am. Compl.) ¶¶ 1–2, 8–10. Horn alleges that her brief period of employment at CRC was marked by sexual harassment and discrimination, and that she was ultimately terminated because of her race.

### A.    Factual Background

The following facts are undisputed except where otherwise noted.

Horn began working for CRC as an IT Project Manager on June 9, 2015, placed there through third-party staffing agency Experis.[1] Dkt. Nos. 112-1 (Horn Depo.) at 3; 112-4 (Cosgrove Depo.) at 47. Sylvia Cosgrove hired Horn and was her manager at CRC. Dkt. Nos. 112-1 at 2; 112-4 at 12–13. Horn and Cosgrove met in person for the first time on Horn's first day of work. Dkt. Nos. 112-1 at 3. At this meeting, Cosgrove told Horn that Frank Yang, another IT Project Manager who contracted with CRC, would be training her. *Id.* at 8.

Horn's position with CRC required her to manage two IT infrastructure projects, which included creating "milestone plan[s]," developing cost estimate Excel spreadsheets, identifying "action items," and generating a "go-live" task list. Dkt. No. 112-3 (Yang Depo.) at 5–11, 43; *see also* Dkt. No. 112-1 at 39–43. The position also required providing regular status reports to her managers. Dkt. No. 112-4 at 3.

During her employment, Horn attempted numerous times to contact and set up meetings with Yang and Cosgrove to get instructions and training for her position. Dkt. No. 112-4 at 50–55. Horn claims she received no communication from Cosgrove after they first met face-to-face on June 9, 2015. Dkt. Nos. 10 ¶¶ 17–25, 30; 112-1 at 51, 57. CRC disputes this. Dkt. No. 112 at 25–26; *see also* Dkt. No. 112-4 at 25–26. However, it is undisputed that Horn received at least some on-site training, Dkt. Nos. 112-1 at 25; 112-4 at 32, and received sample spreadsheets meant to provide examples of her expected

---

[1] CRC does not dispute that it is Horn's employer for Title VII and FEHA purposes. *See* Dkt. No. 128 (June 27, 2018 Hr'g on Mot.)

budgets and "deliverables." Dkt. Nos. 112-1 at 41–43, 112-4 at 25, 32.

On June 10, 2015, CRC sent Horn on a business trip to Kansas City. Dkt. No. 112-1 at 15–23. Horn was required to share a rental car with Yang to travel from the airport in Columbia, Missouri to Kansas City and back. *Id.* at 13, 16. Another employee who had been placed with CRC through another third-party staffing company, Eric Anderson, was provided a rental car of his own. Dkt. No. 112-5 (Anderson Depo.) at 3.

On June 12, 2015, Horn and Yang drove back to the airport together. The parties dispute what happened during the ride. Horn alleges that Yang told her a racially charged story about his grandparents visiting the South and being told not to thank African American restaurant employees. Dkt. No. 112-1 at 19–21. Horn also alleges Yang looked at her breasts inappropriately and at one point asked, "What would you say if I stopped over here at this adult book/video store?" Dkt. Nos. 10 ¶¶ 63–69; 112-1 at 33. Yang agrees that he told the story of his grandparents witnessing racism, but denies the other allegations. Dkt. No. 112-2 at 12. Horn also claims that Yang bullied her throughout her employment, including calling her a "dumb-ass project manager." Dkt. Nos. 115 at 8; 112-1 at 38. Yang denies these allegations. Dkt. Nos. 112-2 at 14; 112-3 at 36.

CRC terminated Horn's employment on July 2, 2015. Dkt. No. 10 ¶ 10.

## B. Procedural History

On October 1, 2015, Horn filed a charge with the Equal Employment Opportunity Commission (EEOC) alleging that CRC violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the California Fair Employment and Housing Act (FEHA), Cal. Gov. Code §§ 12900–12996. *See* Dkt. No. 10-2. The EEOC dismissed the charge on March 7, 2017. *See* Dkt. No. 10-1. Horn filed the complaint initiating this action on April 19, 2017. Dkt. No. 1. Horn later amended the complaint in response to the Court's sua sponte screening under 28 U.S.C. § 1915. Dkt. No. 10.

The amended complaint brings five causes of action: (1) race discrimination under Title VII; (2) race discrimination under FEHA; (3) failure to prevent sexual harassment and retaliation under Title VII and FEHA; (4) wrongful termination in violation of public

policy; and (5) negligent infliction of emotional distress. *Id.*

The Court has original subject matter jurisdiction over Horn's federal claims under 28 U.S.C. § 1331, and supplemental jurisdiction over her state claims pursuant to 28 U.S.C. § 1367. Both parties have consented to the jurisdiction of a magistrate judge under 28 U.S.C. § 636(c). Dkt. Nos. 7, 32 at 5.

CRC moves for summary judgment, and Horn opposes the motion. Dkt. Nos. 112, 115. The Court heard oral argument on the motion on June 27, 2018. Dkt. No. 128.

## II. LEGAL STANDARD

Summary judgment may be granted only when, drawing all inferences and resolving all doubts in favor of the nonmoving party, there is a genuine dispute as to any material fact. Fed. R. Civ. P. 56(a); *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014); *Celotex Corp.v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under governing substantial law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## III. DISCUSSION

In support of its summary judgment motion, CRC argues that: (1) Horn failed to exhaust administrative remedies as to her sexual harassment and retaliation claims; (2) the evidence does not support a sexual harassment claim; (3) the evidence does not support a race discrimination claim; and (4) the evidence does not support a negligent infliction of emotional distress claim. *See* Dkt. No. 112. The Court addresses each argument.

### A. Exhaustion of Administrative Remedies

CRC's first argument is that Horn failed to exhaust administrative remedies as to her federal and state sexual harassment and retaliation claims because she checked only the "Race" box in her EEOC charge and did not allege facts pertaining to sexual harassment. Dkt. No. 112-1 at 72.

Administrative exhaustion is required for subject matter jurisdiction to lie under both Title VII and FEHA. *Lyons v. England*, 307 F.3d 1092, 1103–04 (9th Cir. 2002);

*Okoli v. Lockheed Technical Operations Co.*, 36 Cal. App. 4th 1607, 1613 (1995). Under Title VII, the plaintiff must file a charge with the EEOC, and under FEHA, the plaintiff must file a charge with the Department of Fair Employment and Housing (DFEH). Here, it is undisputed that Horn filed an EEOC charge, and the EEOC right-to-sue notice letter notes that Horn's charge was "dual filed with the [DFEH]" in accordance with California Government Code §§ 12960, 12962. Dkt. No. 10-2. Thus, the EEOC charge applies to Horn's Title VII and FEHA claims.

The question is what Horn's EEOC charge encompassed. "The scope of the administrative charge defines the scope of the subsequent civil action, and unlawful conduct not included in an administrative complaint is not considered by a court unless the conduct is like or reasonably related to the allegations in the administrative complaint, or can reasonably be expected to grow out of an administrative investigation." *Leland v. City & Cty. of San Francisco*, 576 F. Supp. 2d 1079, 1090 (N.D. Cal. 2008) (citing *Lyons*, 307 F.3d at 1104; *Okoli*, 36 Cal. 4th at 1614–17). The Ninth Circuit has instructed that courts should "construe the language of EEOC charges with utmost liberality since they are made by those unschooled in the technicalities of formal pleading." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1100 (9th Cir. 2002) (internal quotation marks omitted).

The Court evaluates Horn's EEOC charge, first as it pertains to her sexual harassment claim, and then as it pertains to her retaliation claim.

### 1. Horn Exhausted EEOC Remedies for Her Sexual Harassment Claim.

First, the record shows that, while Horn checked only the "Race" box on her EEOC charge, she detailed all of the events giving rise to her sexual harassment claim in the "charging party rebuttal" filed with the EEOC on December 19, 2016. Dkt. No. 116-1 at 49–52. Horn's sexual harassment claim is presented by detailing the car ride with Yang in which he looked at her suggestively and joked about an adult book store. *Id.* at 51–52. Construing the language in Horn's rebuttal "with utmost liberality," the Court finds that Horn's allegation of sexual harassment was presented sufficiently to consider her

administrative remedies exhausted. Therefore, the Court has subject matter jurisdiction over the sexual harassment claim.

### 2. Horn Failed to Exhaust EEOC Remedies for Her Retaliation Claim.

In contrast, Horn did not detail events in her charge or charging party rebuttal that could reasonably give rise to a retaliation claim. A point of clarification is in order: Horn appears to based her retaliation claim on the argument that Yang retaliated against her for "not accepting his advancement for sexual harassment" by being "very rude" to her, including calling her a "dumb-ass project manager." Dkt. Nos. 115 at 19; 112-1 at 63–64. This misconstrues the nature of a retaliation claim. Title VII and FEHA prohibit an employer from retaliating against an employee specifically for opposing discriminatory employment practices that those statutes proscribe. *See Miller v. Fairchild Industries*, *Inc.*, 885 F.2d 498, 503–504 (9th Cir. 1989). In other words, Title VII and FEHA prohibit an employer from taking adverse action against someone who has complained to someone else that a Title VII or FEHA violation occurred.

Nowhere does Horn's EEOC charge (or any other piece of evidence) allege that, before her termination, Horn complained to anyone of race discrimination or sexual harassment. Dkt. Nos. 10-1; 10-2; 116-1 at 49–55. Horn's charging party rebuttal does allege that Cosgrove complained to her Experis manager, Tanya Rosado, about Cosgrove's alleged lack of communication.[2] Dkt. No. 116-1 at 51. But this is different from complaining about race discrimination or sexual harassment; neither Title VII nor FEHA protects against generic uncourteousness. *Cf. Leland*, 576 F. Supp. 2d at 1091 (finding exhaustion for a retaliation claim where the administrative complaint "charged that when [the plaintiff] complained about differential treatment *on account of her race and other protected characteristics*, she was reassigned to a different location") (emphasis added). To the contrary, the undisputed fact of the matter is that Horn did not complaint of sexual

---

[2] Horn also testified at deposition that she complained to Rosado about Yang being "rude" and "condescending," Dkt. No. 112-1 at 45, 61, though this does not appear in the EEOC charge and would not change the analysis even if it did appear there.

harassment or race discrimination to anyone prior to filing the EEOC charge. Dkt. No. 112-1 at 60–65 (Q: "Other than reporting the sexual harassment by Mr. Yang to the EEOC, did you report it to anyone else? A: No, I did not."); *see also* Dkt. Nos. 112-2 at 12–13; 112-3 at 35–36; 112-4 at 8; 112-6 at 18–19. Thus, Horn did not exhaust administrative remedies as to her retaliation claim. The Court therefore dismisses Horn's retaliation claim under Title VII and FEHA for lack of subject matter jurisdiction.

### B. Horn's Evidence Does Not Support A Sexual Harassment Claim.

The Court next turns to the merits of Horn's sexual harassment claim. Title VII's prohibition against sex discrimination "extends to the creation of a hostile work environment that 'is sufficiently severe or pervasive to alter the conditions of the victim's employment.' " *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). "To prevail on a hostile work environment claim, an employee must show that her employer is liable for the conduct that created the environment." *Id.* (citing *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 966 (9th Cir. 2002).

A prima facie hostile work environment claim requires evidence that: (1) the plaintiff was subjected to sexual advances; (2) the advances were unwelcome; and (3) the conduct was "sufficiently severe and pervasive to alter the conditions of . . . employment and create an abusive working environment." *Ellison v. Brady*, 924 F. 2d 872, 875 (9th Cir. 1991). "California courts have adopted the same standard for hostile work environment sexual harassment claims under the FEHA." *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264, 279 (2006).

To prevail on such a claim, a plaintiff must establish a pattern of ongoing and persistent harassment. *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104, 1108 (9th Cir. 1998). Also, the plaintiff must prove that the workplace is both "objectively and subjectively offensive." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). In determining if an environment is sufficiently hostile to violate Title VII and FEHA, the Court looks at all circumstances including: frequency of improper conduct; severity;

whether it is physically threatening or humiliating or a mere offensive utterance; and whether it interferes with an employee's work performance. *Nichols v. Azteca Restaurant Enterprises, Inc.*, 256 F.3d 864, 872 (9th Cir. 2001). Simple teasing, offhand comments, or isolated incidents do not sustain a charge of sexual harassment unless "extremely serious." *Id.* (quoting *Faragher*, 524 U.S. at 778).

Horn's sexual harassment claim is based exclusively on the June 12, 2015, car ride with Yang. Dkt. No. 10 ¶ 64–72. Horn alleges that Yang's behavior subjected her to a hostile work environment because he looked at her suggestively and joked about stopping at the adult book store. *Id.*; Dkt. No. 112-1 at 31–34. The Court finds that Horn's claim, as alleged, meets the first two requirements: a triable issue exists as to whether Yang made unwanted sexual advances. However, the Court finds that Horn's claim does not meet the third requirement because, even as alleged, Yang's conduct was not objectively severe or pervasive enough to create an abusive working environment. *See Walpole v. City of Mesa*, 162 Fed. App'x 715, 716 (9th Cir. 2006) (holding that two staring incidents, coupled with defendant's failed romantic attempts were not sufficiently severe or pervasive). Horn's own testimony indicates that Yang's comment, though distasteful and clearly upsetting to Horn, amounts to an "offhand comment" of "simple teasing." *Faragher,* 524 U.S. at 788; *see* Dkt. No. 112-1 at 33 ("[B]efore I could get anything out of my mouth, he looked at me and he said, 'Oh, I was just kidding.' "). As Horn alleges only this isolated incident giving rise to her sexual harassment claim, the Court finds that her claim lacks both the allegations and evidentiary support to establish a prima facie case and defeat summary judgment. Summary judgment is therefore GRANTED on Horn's sexual harassment claim under Title VII and FEHA.

### C. Horn's Evidence Does Not Support Her Racial Discrimination Claims.

As the core of her case, Horn alleges that CRC discriminated against her on account of her race, and in particular, terminated her because she is African American. The Court analyzes Horn's Title VII, FEHA, and wrongful termination in violation of public policy claims together, because all three claims rely on the same burden-shifting framework

espoused in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *Nelson v. United Technologies*, 74 Cal. App. 4th 597, 613 (1999); *see also Loggins v. Kaiser Permanente Intern.*, 151 Cal. App. 4th (2007).

Under the first step of the *McDonnell Douglas* framework, Horn must establish a prima facie case of wrongful termination based on racial discrimination. *See Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654, 658–59 (9th Cir. 2002) (citing *McDonnell*, 411 U.S. at 802–804). Then, at the second step, the burden shifts to CRC to articulate a legitimate, nondiscriminatory reason for terminating Horn. *Id.* Finally, at step three, Horn has the opportunity to show that the proffered reason is pretext for unlawful discrimination. *Id.* "In the alternative, a plaintiff may simply produce direct or circumstantial evidence demonstrating that a discriminatory reason 'more likely than not motivated' the employer." *Reynaga v. Roseburg Forest Prod.*, 847 F.3d 678, 691 (9th Cir. 2017) (quoting *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007)). The Court proceeds through each step.

### 1. Horn Establishes a Prima Facie Case.

First, at the prima facie stage, Horn must show: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably or she was otherwise discharged under circumstances giving rise to an inference of discrimination. *Id.* at 659.

These requirements are satisfied here. As to the first requirement, Horn is an African American woman and therefore a member of a protected class. *See* 42 U.S.C. § 2000e–2(a)(1). On the second requirement, Horn includes her resume in the record, which details her extensive experience as a project manager. Dkt. No. 116-1 at 113–116. This is sufficient to establish Horn's qualifications at the prima facie stage. *See Aragon*, 292 F.3d at 659 (explaining that subjective personal judgments of competence are relevant at the prima facie stage). The third requirement is satisfied because Horn's termination is an adverse employment action. *See*, *e.g.*, *id.* And as to the fourth requirement, it is

undisputed that Horn was the only project manager terminated. *See Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003), *as amended* (Jan. 2, 2004) ("[I]ndividuals are similarly situated when they have similar jobs and display similar conduct."). For example, Yang, who is Asian American, suffered no adverse employment action. Dkt. Nos. 112-1 at 20; 112-7 at 14. Furthermore, it does not appear that CRC intended to abandon the projects Horn was managing, because their gripe with Horn was that she was not "ramp[ing] up" the projects fast enough. Dkt. No. 112-1 at 53. This too can give rise to an inference of discrimination. *Diaz v. Eagle Produce*, *Ltd.*, 521 F.3d 1201, 1207–08 (9th Cir. 2008) (explaining that an inference of discrimination can be established by showing that the employee's services are still in need). Horn has therefore established her prima facie case.

### 2. CRC's Proffered Reason for Termination

Next, at step two, CRC offers at least two distinct non-discriminatory reasons for terminating Horn: (1) she lacked the required Excel skills; and (2) she did not "ramp up the project plan fast enough." Dkt. No. 112 at 4–5. In Yang's deposition testimony, he describes how Horn made a mistake on an Excel spreadsheet that undermined his confidence in her work and would force him to double check all of Horn's future work. Dkt. No. 112-3 at 38–39. As such, Yang felt that it was going to hinder the speed of the project plan implementation. *Id.* Cosgrove also confirmed Horn's inability to perform "basic" functions and produce reports on time. Dkt. No. 112-4 at 5. The Court finds that Cosgrove and Yang's testimony support the legitimacy of the two proffered non-discriminatory reasons for Horn's termination. *See*, *e.g.*, *Aragon*, 292 F.3d at 661 (finding slow pickup of trash and trouble adapting to the new position were legitimate non-discriminatory reason for lay off).

### 3. Horn Does Not Raise a Triable Issue of Pretext.

Finally, at step three Horn must show that CRC's proffered nondiscriminatory reason is mere pretext, or otherwise show it is more likely than not that discrimination motivated her termination. Before evaluating Horn's evidence supporting pretext, the

Court evaluates CRC's assertion that the so-called "same actor inference" applies here to raise the burden on Horn. Then, the Court evaluates Horn's evidence of pretext and discriminatory motive.

### a. The Same Actor Inference Does Not Apply.

Evidence is "rarely sufficient" to find that an employer's asserted justification is false when the actor who allegedly discriminated against the plaintiff had previously shown willingness to treat the plaintiff favorably. *Coghlan v. American Seafoods Co. LLC.*, 413 F.3d 1090 (9th Cir. 2005); *Bradley v. Harcourt, Brace Co.*, 104 F.3d 267 (9th Cir. 1996).

Here, Cosgrove was both the hiring and firing actor and, as such, Ninth Circuit precedent dictates that her actions be presumed non-discriminatory. However, Horn challenges this presumption based on the allegation that Cosgrove did not know Horn was African American until the two met in person on Horn's first day of work. Dkt. No. 113 at 5. On that basis, Horn alleges Cosgrove cannot be presumed non-discriminatory because Cosgrove hired her without knowing she was African American.

At the hearing on this motion, CRC countered that Cosgrove knew Horn's race before hiring her because Horn submitted a copy of her photo I.D. in her application to CRC. *See* Dkt. No. 128 (June 27, 2018 Hr'g on Mot.). CRC also alleges that Cosgrove offered to make Horn's assignment permanent at the in-person meeting and therefore, Cosgrove showed willingness to treat Horn favorably after finding out she was African American. Dkt. Nos. 112 at 25 n.12; 128. However, CRC does not provide evidence to support either allegation, and Horn claims that she had already accepted the permanent position before Cosgrove brought it up in person.

Amidst these disputed facts, the undisputed fact that Cosgrove and Horn met for the first time face-to-face on June 9, 2015, gives rise to the reasonable inference that Cosgrove did not know Horn was African American before that day. That reasonable inference is not foreclosed by CRC's unsupported allegations. Furthermore, all reasonable inferences must be made at summary judgment in favor of the nonmoving party. *Tolan*, 134 S. Ct. at

1863.  Thus, the Court assumes that Cosgrove did not know Horn's race until after Horn

was hired and does not consider Horn's evidence of pretext in light of the "same actor

inference."  The typical standard of proof—rather than a heightened one—therefore

applies to Horn's step-three evidence.

### b.  Horn's Evidence Does Not Establish Pretext.

As noted earlier, a plaintiff can meet her step-three burden "either directly by

persuading the court that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence."

*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998), *as amended* (Aug. 11,

1998) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).  For

the first option, "the plaintiff need produce very little evidence of discriminatory motive to

raise a genuine issue of material fact."  *Id.* (internal quotation marks omitted).  On the

second option, "circumstantial evidence . . . of 'pretense' must be 'specific' and

'substantial' in order to create a triable issue."  *Id.* at 1222.

To satisfy her step-three burden, Horn offers the following categories of evidence:

(1) Cosgrove ignoring Horn; (2) Yang's racially charged story in the rental car; (3)

Anderson being provided his own rental car while Horn was not; (4) Yang and Cosgrove's

refusal to train Horn; (5) Horn's prior work experience and purported Excel skills; and (6)

CRC's shifting proffered reasons for Horn's termination.

The first four of these categories are properly characterized as direct evidence of

discrimination, because Horn offers them to show that Cosgrove held racially

discriminatory animus toward Horn.  The latter two categories aim to evince pretext,

purporting to show that Horn was in fact qualified for her job and CRC's reasons for her

termination are bogus.  Accordingly, "very little" evidence is needed for the first four

categories, while evidence in the fifth and sixth category must be "specific" and

"substantial" in order to create a triable issue of discrimination.  *Godwin*, 150 F.3d at

1220–22.  The Court finds that none of this evidence raises a triable issue of material fact.

### i. Cosgrove Ignoring Horn

First, Horn alleges that Cosgrove intentionally ignored her after meeting her face to face on June 9, 2015. Horn's evidence does not support this allegation of racial animus.

Most importantly, the evidence does not support an inference that Cosgrove changed her attitude toward Horn after meeting her in person, because Horn does not provide evidence of her communications or interactions with Cosgrove before their first meeting. In fact, the communications Horn does provide show that Cosgrove communicated primarily or exclusively with Rosado of Experis to coordinate Horn's hiring, not with Horn herself. Dkt. No. 116-1 at 7–8. This makes it impossible to compare Cosgrove's demeanor toward Horn before and after discovering her race.

Second, the evidence does not support Horn's allegation that Cosgrove completely ignored her. The record does contain several unanswered emails from Horn to Cosgrove and only one email directly from Cosgrove to Horn. Dkt. Nos. 1-1 at 122–29; 129-1. However, the record also contains a number of emails from other employees to Horn on which Cosgrove is copied. Dkt. No. 129-1. And on June 15, 2015, Cosgrove copied Horn on an email to another employee, Alvin Lorilla, enlisting Lorilla to "follow-up with [Horn] on her outstanding items." Dkt. No. 129-2 at 5. Thus, the evidence shows little, though some, response by Cosgrove.

Furthermore, Cosgrove testified that she may have responded to Horn's emails in ways other than email: "Q. [by Horn:] Okay. So this is an e-mail you could respond in a lot of different ways, but you don't know if you responded at all? A. [by Cosgrove:] I know I responded. I just don't know if I did it via e-mail. Q. And when you say you responded, you're saying you responded to me? A. To you." Dkt. No. 116-1 at 71–72. This testimony is a reminder that the absence of evidence of communication does not necessarily prove that communication did not in fact occur.

Finally, Horn acknowledges being told that Cosgrove was "busy with the buyout of Acadia" during the weeks Horn worked for CRC. Dkt. No. 112-1 at 45. This evidence suggests that Cosgrove's mere lack of communication, without more, does not necessarily

expose racial animus, as opposed to some other explanation.

Thus, Horn's only evidence on this issue is her own testimony—which is at least partly contradicted by other evidence in the record—that she was ignored. Even construing the evidence in Horn's favor, there is nothing on which to base a finding that Cosgrove *changed* her attitude toward Horn after meeting her, and even if there were, it is simply Horn's subjective perception that the reason for the purported change was her race. This subjective belief is not enough to raise a triable issue of discriminatory motive. *Schuler v. Chronicle Broad. Co. Inc.*, 793 F.2d 1010, 1011 (9th Cir. 1986) ("[S]ubjective personal judgments do not raise a genuine issue of material fact.").

### ii.    Yang's Racially Charged Story

Next, Horn alleges she observed Yang's racial bias when Yang told her the racially charged story during their car ride from Kansas City. The parties agree that Yang told a story in which Yang's parents stopped at a restaurant in Mississippi and were told by a restaurant employee that they should not thank an African American employee because "they don't matter." Dkt. 112-1 at 20; 112-2 at 13–14. This is relevant to her termination, Horn asserts, because it shows Yang harbored racist views and used a long-standing friendship with Cosgrove to influenced Cosgrove to fire Horn. Dkt. No. 115 at 6.

On the latter point that Yang influenced Cosgrove, Horn submits her own testimony that she felt Yang influenced Cosgrove, and the deposition testimony of CRC employees that Cosgrove and Yang were friends or colleagues. Dkt. No. 112-1 at 60; 112-4 at 7; 112-7 at 3; 116-1 at 4–8. Horn also includes CRC's answer to an interrogatory that "Frank Yang and Merrell Wilson shared their own concerns with [Horn's] performance from time to time based on their respective experiences with her, but Ms. Cosgrove did not involve them in the decision-making process regarding her decision to end [Horn's] temporary assignment early." Dkt. No. 116-1 at 99. The Court finds that this evidence is sufficient to raise a triable issue of Yang's influence over Cosgrove's termination decision. *See Poland v. Chertoff*, 494 F.3d 1174, 1182–83 (9th Cir. 2007) (finding a subordinate's ill motives can be imputed to the employer if the plaintiff can prove that "the biased subordinate

influenced or was involved in the [termination] decision.").

However, Horn still does not raise a triable issue of discrimination, because the evidence does not support an inference that Yang was racially biased against Horn. While Horn testified that Yang's story made her uncomfortable, she does not offer evidence about the story showing that Yang—as opposed to the person in the story—held racist views. To the contrary, Yang testified that the comment to his parents was "a very, very poor statement," and that the experience was "one of the reasons why [Yang's parents] wouldn't go back . . . to Mississippi." Dkt. No. 112-2 at 13–14. Second, even assuming the story did reflect racist tendencies in Yang, Yang did not make the comment in direct reference to Horn or her work. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918–19 (9th Cir. 1996) (finding the comment that employee was an "old timer" was not evidence of discriminatory motive because it was not directly related to termination). Thus, there is no support for racial bias that can be imputed to Cosgrove or CRC.

Overall, Horn's theory on this point requires a chain of inferences: that Yang's racially charged story equals racism by Yang; that Yang's racism caused him to negatively evaluate Horn's work; and that Yang's racially motivated dislike of Horn influenced Cosgrove's decision to terminate Horn. While the evidence supports the third inference, it does not support the first two. Thus, there is no triable issue on this point.

### iii.    Anderson's Rental Car

Next, Horn alleges that Anderson, a white employee placed with CRC through a hiring service, was provided a rental car for the business trip to Kansas City, whereas Horn was denied her own rental car. At the hearing, Horn argued that CRC provided this favorable treatment based on race. *See* Dkt. No. 128. CRC disputes this assertion and insists the rental car was paid for by Anderson's hiring service, not CRC. Dkt. No. 112 at 23. Horn provides no evidence that CRC paid for Anderson's rental car, whereas Cosgrove and Anderson both testified that Anderson's staffing company paid for his car. Dkt. Nos. 112-4 at 20–22; 112-5 at 13. And even if CRC reimbursed Anderson's staffing company but not Horn's, it is undisputed that another supervisor, Merrell Wilson, would

have approved Anderson's rental car—not Cosgrove. Dkt. Nos. 112-4 at 20–22; 112-5 at 13. Thus, it is not reasonably disputed whether CRC (and in particular Cosgrove) paid for Anderson's car but not Horn's; the evidence shows someone other than Cosgrove decided to fund Anderson's car. Furthermore, there is no indication whatsoever that race played a role in the car assignments, other than the mere fact that Horn is African American and Anderson is not.

Between the lack of evidence that CRC paid for Anderson's car and the lack of evidence that race played any role in the car assignment, Anderson's rental car does not create a triable issue of discrimination.

### iv.    Lack of Training

Horn alleges that CRC intentionally prevented her from performing adequately because they did not train her sufficiently. This argument supports her claim in two ways: it suggests she was treated discriminatorily outright,[3] and it undermines CRC's proffered reason for termination by suggesting that any shortcomings in job performance stemmed from the very discrimination of which Horn complains.

However, Horn does not offer evidence showing that she received less-than-normal training. CRC asserts that project managers were hired with the expectation of Excel and management proficiency and little need for in-depth training. For example, Yang testified that CRC "needed somebody to be able to come in and just run with it with just, you know, some minimal training, already knowing Excel. And then just be able to take off and run on their own." Dkt. No. 112-3 at 43. Yang also testified that he provided Horn with approximately eight total hours of training during their business trip in addition to sample spreadsheets to help Horn learn her responsibilities. Dkt. No. 112-3 at 15–17. According to Yang, no other employee was provided with more than 3 hours of training. *Id.*

---

[3] The alleged lack of training could be considered an adverse employment action in and of itself. *See, e.g.*, *Lelaind*, 576 F. Supp. 2d at 1098 (holding that a manager's negative treatment could be found to be an adverse employment action if it "negatively and materially affected" the plaintiff's "ability to acquire and develop skills to advance up the career ladder"). However, that does not change the analysis here because, as discussed, Horn does not present evidence that she received less-than-ordinary training.

Cosgrove testified that the business trip was to serve as "on-site" training. Dkt. No. 112-4 at 32. Horn does not dispute that she received at least some training: her testimony confirms that she did a site visit with Yang and other managers, Dkt. No. 112-1 at 25, participated in "a few calls" with Yang, Dkt. No. 112-2 at 24, and trained on Excel spreadsheets with Yang. Dkt. No. 112-1 at 39.

Still, Horn argues that she sent several emails attempting to set up training meetings and no additional training ever resulted. Dkt. No. 116-1 at 122–29. However, if true, this merely establishes that Horn did not receive the training she wanted; it does not rebut the evidence that she received an ordinary or even greater than ordinary amount of training. *See Cornelio v. Wassermann*, No. 10-cv-2023-PHX-GMS, 2012 WL 3028344, at *5 (D. Ariz. July 24, 2012) ("Plaintiff's perception of having received inadequate training, without more, fails to demonstrate pretext."), *aff'd sub nom. Cornelio v. Alfa Wasserman Diagnostic Techs., LLC*, 582 F. App'x 717 (9th Cir. 2014). And as with Horn's other types of evidence, even assuming she did receive insufficient training, there is no indication that race was the cause.

In sum, Horn provides no evidentiary support to show that the training she received was any less than what was promised or provided to other employees. Horn's perceived lack of training illustrates a frustrating start to a new job, but it does not raise a triable issue of race discrimination.

### v. **Horn's Past Work Experience**

Next, in an effort to show pretext, Horn attempts to rebut CRC's dissatisfaction with her Excel skills by offering evidence of her past work as a project manager and affidavits from three past employers attesting to her exceptional Excel abilities. Dkt. No. 116-1 at 112–21. However, this generalized evidence does not rebut CRC's specific proffered reasons. Yang's testimony offers a specific instance of Horn's poor work—incorrectly entering values into an Excel spreadsheet—that undermined CRC's confidence in her. Dkt. No. 112-3 at 38–39. Horn does not dispute that she made the specific error; instead she offers the general evidence of her Excel abilities to challenge the specific

showing by CRC.  In challenging the specific with the general, Horn has failed to establish a triable issue of pretext.  *See Matsushita Elec. Industrial Co. v. Zenith Radio,* 475 U.S. 574, 586 (1986) (explaining that after moving party meets its burden of affirmatively negating an element of the claim, nonmoving party must come forward with specific facts showing that there is more than a mere metaphysical doubt for trial).

Furthermore, "an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact." *Bradley*, 104 F.3d at 270; *see also Schuler*, 793 F.2d at 1011 (finding no genuine dispute of material fact where the plaintiff "[said] repeatedly that she 'felt' competent and was 'confident of [her] skills' ") (second alteration in original).

### vi.    Shifting Termination Explanations

Finally, Horn argues that pretext is clear from CRC's inconsistent explanations for terminating her. Dkt. No. 115 at 21–22.  Horn alleges that CRC provided her with multiple explanations for her termination: she failed to come through with "deliverables;" her Excel skills were inadequate; she did not "ramp up" her projects fast enough; and her general job performance was poor. Dkt. Nos. 128; 112-4 at 3.   However, all these reasons generally speak to the same issue: CRC was not satisfied with Horn's work performance. The Court finds that these explanations are "not incompatible" such that they establish a triable issue of fact.  *See Shaffner-Huckaby v. Raley's*, 428 Fed. App'x 720, 723 (9th Cir. 2011) (finding explanations for termination that were not identical but all relevant to plaintiff misreporting her time in violation of company policy not sufficient to defeat summary judgment); *see also Aragon*, 292 F.3d at 661–62 (holding that courts do not infer pretext from simple fact that employer presents different but consistent reasons for termination).  CRC's different but consistent explanations therefore do not create a triable issue of pretext.

### vii.    Conclusion on Race Discrimination Claims

In sum, the Court finds that Horn lacks the evidentiary support to show that CRC's proffered explanation for her termination was pretext.  By her own words, "[t]he only

person that made comments about [Horn's] race was Frank Yang, about his grandparents traveling through the South," Dkt. No. 112-1 at 56, and the Court has already addressed why this does not create a triable question of discrimination. The rest of Horn's circumstantial evidence more or less presumes the racial animus it is offered to prove. Whether the lack of communication from Cosgrove, the lack of training from Yang, or Anderson's rental car, Horn perceived negative treatment and concluded that the only reasonable explanation was racial animus. Essentially, Horn's argument is: "What else could it be?" But this kind of empty assumption is a far cry from providing concrete evidence of racial discrimination. To be sure, racial bias can operate in hidden, hard-to-prove ways, and the Court is sympathetic to that difficulty. But defeating summary judgment requires evidence. Here, Horn has not met her evidentiary burden under step three of the *McDonnell Douglas* test to show that CRC's proffered reasons are pretext for racial discrimination. The Court therefore GRANTS CRC's motion for summary judgment on Horn's race-based Title VII, FEHA, and wrongful termination claims.

### D. Horn's Negligent Infliction of Emotional Distress Claim Fails with the Other Claims.

Negligent infliction of emotional distress is a form of the tort of negligence requiring: (1) duty owed, (2) breach of that duty, (3) causation, and (4) damages. *Corales v. Bennett*, 567 F.3d 554, 572 (9th Cir. 2009) (citing *McGarry v. Sax*, 158 Cal. App. 4th 983, 994 (Ct. App. 2008)). CRC certainly owed Horn a duty as her employer—specifically, not to sexually harass her, discriminate against her, or allow a hostile work environment. *See Ellison*, 924 F.2d at 875–76 (finding employer duty of preventing hostile work environment). However, as discussed above, Horn does not present a triable issue as to sexual harassment or racial discrimination. Thus, Horn does not present a triable issue as to a critical element of her claim—breach. Therefore, the Court GRANTS summary judgment as to the NIED claim.

## IV. CONCLUSION

Horn was terminated after only three weeks of employment with CRC, and the

Court acknowledges that her experience there was an unpleasant one. The testimony and evidence Horn has submitted suggests that she was thrown into the deep end without the communication or training she had hoped for. Her frustration is understandable. The Court also acknowledges that Horn's time with Yang may have been difficult and uncomfortable for her. However, this is a case about illegal discrimination, not interpersonal workplace disputes. The evidence on record does not create a triable issue on Horn's claims that she was subjected to a workplace made hostile by sexual harassment or terminated because of her race. Accordingly, CRC's motion for summary judgment is GRANTED on all claims. The Court will enter judgment in CRC's favor.

**IT IS SO ORDERED.**

Dated: July 13, 2018

_____
NATHANAEL M. COUSINS
United States Magistrate Judge